NELSON STORY III AND VELMA E. STORY, PETITIONERS, *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88371. Filed September 24, 1962.

*Peter Meloy, Esq.,* and *Robert C. Johnson, Esq.,* for the petitioners.
*Joseph D. Holmes, Esq.,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petition-
ers' income tax for the years 1955, 1956, 1957, and 1958 in the amounts
of $861.39, $1,129.02, $2,212.29, and $2,027.38, respectively.

As a result of concessions by the parties, the only issue remaining
for decision is whether petitioners are entitled to deduct as charitable
contributions to Soldiers Chapel Corporation (hereinafter referred
to as Soldiers Chapel), under section 170 of the 1954 Code, the amount
of $6,200 in 1957 and the amount of $6,100 in 1958. Petitioners
advanced the sum of $45,194.68 to build a chapel for Soldiers Chapel
in 1955 and received a note in that amount,[1] which note, by endorse-
ments thereon, petitioners forgave to the extent of $8,000 in 1955,
$8,900 in 1956, $6,200 in 1957, and $6,100 in 1958. Respondent deter-
mined that a gift of the entire amount was made in 1955, so there
were no deductible gifts on this account for 1956, 1957, and 1958,
but recognized that a gift by Velma of the land on which the chapel
was built in 1956 entitled petitioners to a charitable deduction for
that year of the maximum amount allowable under the law.[2]

#### FINDINGS OF FACT.

Nelson Story III and Velma E. Story (hereafter referred to as
petitioners or as Nelson and Velma, respectively) are husband and
wife and resided in Bozeman, Montana, during the period here in-
volved. They filed joint Federal income tax returns for the taxable

---

[1] The face of the note was $45,269, the estimated cost of the chapel, whereas petitioners
actually advanced only $45,194.68 during 1955.

[2] Respondent also determined that Soldiers Chapel was not a "church" within the mean-
ing of section 170(b), thus limiting the allowable deduction for charitable contributions
to 20 percent of petitioners' adjusted gross income rather than 30 percent as claimed by
petitioners. Respondent conceded at the trial that Soldiers Chapel qualifies as a "church"
under section 170(b), thus recognizing the full amount of the charitable deductions
claimed in 1955 and 1956.

years 1955 through 1958 with the district director of internal revenue, Helena, Montana.

Petitioners' son was killed in World War II while serving with the 163d Infantry Regiment, a Montana National Guard unit. After the war petitioners considered building a memorial of some kind in his memory in Gallatin Canyon near Bozeman. They decided to make provision in their wills for construction of a chapel on their land which could be used for church services by people living near Gallatin Canyon and by tourists visiting and vacationing in the area.

In 1954 petitioners heard that residents in the Gallatin Canyon area were planning to build a chapel on land adjoining theirs. Petitioners decided to join forces with this group to build their proposed chapel while they were living rather than to bequeath an amount for its construction after their deaths. Nelson told some of his neighbors in Gallatin Canyon that he would lend them the money to build the chapel if it was built generally to petitioners' specifications and if petitioners could supervise its construction. Petitioners attended several meetings of the residents of the Gallatin Canyon area and representatives of the Bozeman Ministerial Association relative to the project, as a result of which it was decided to form a corporation to build a chapel on land to be donated by Velma. Incorporators, representing the ministerial association, the Gallatin County Improvement Association, and the Montana National Guard, were chosen. Reverend Lyle J. Onstad, a Lutheran minister, was chosen to be president of the organization, and Howard Nelson (referred to herein as Howard), a mortician in Bozeman and a colonel in the 163d Infantry Regiment, was chosen as secretary-treasurer. An attorney from Bozeman was chosen to draft the corporate charter and bylaws and perform the necessary legal work for the organization.

On May 6, 1955, about 20 interested persons, including 11 of the 13 people who had been chosen to be the incorporators of Soldiers Chapel, met in the attorney's office. A contractor's estimate of building costs of the chapel, in the amount of $45,269, was presented to the assembly and Nelson offered to lend the money to the organization. Nelson asked that he be given a note to evidence the loan and that it be secured by a mortgage on the land on which the chapel was to be built. The attorney advised the incorporators that they should elect officers and authorize them to execute a note in Nelson's favor, and that, although Soldiers Chapel was not yet incorporated, the organization would be obligated on the note. However, he advised that it would be necessary to have a survey of the land made to obtain an accurate description thereof before a mortgage could be given. The attorney advised the group that after the land had been surveyed and had been conveyed to the organization, a new note could be given Nelson together with a mortgage to secure it.

Bylaws for the corporation were also discussed. It was decided, among other things, that the bylaws should provide that the church be nondenominational and that only ministers who were graduates of certain theological seminaries should be permitted to conduct services in the chapel.

Nelson was particularly interested in these provisions, although he at no time had any official connection with the organization or corporation, or with the inclusion of these provisions in the bylaws.

Onstad and Howard were authorized to execute a note on behalf of the organization. On May 6, 1955, they signed and gave Nelson the following note:

THE SOLDIERS CHAPEL CORPORATION after date, for value received, the undersigned, jointly and severally promise to pay to the order of NELSON STORY III payable at First National Bank in Bozeman, Bozeman, Mont. Forty five thousand two hundred sixty nine & no/100_____Dollars with interest at the rate of  – 0 –  percent per annum, payable December 31 annually until paid.

(s)  Lyle J. Onstad
(s)  Howard Nelson

While Onstad and Howard signed the note in their individual capacities, it was understood and intended that the note be an obligation of Soldiers Chapel.

There was no agreement among Onstad, Howard, and Nelson that Nelson would not collect on the note, but Nelson indicated that if his business was good, he would make a substantial donation to the corporation each year. Onstad and the other incorporators hoped there would be no occasion for repayment to be made to Nelson. One of the reasons petitioners wanted a note and mortgage was so they could exercise some influence and control over the construction of the chapel and the manner in which it was operated during its early existence.

On May 6, 1955, a bank account was opened on behalf of the corporation. Nelson deposited the following amounts to this account:

| Date | Amount | Date | Amount |
|---|---|---|---|
| May 6, 1955 | $8,077.10 | Sept. 29, 1955 | $4,925.00 |
| May 25, 1955 | 20,000.00 | 1956 | 4,279.39 |
| Sept. 9, 1955 | 9,726.37 | 1957 | 1,527.86 |
| Sept. 24, 1955 | 2,466.21 | | |

Articles of incorporation were filed June 28, 1955, and Soldiers Chapel was granted a charter on July 9, 1955.

On or about May 6, 1955, construction of the chapel was begun on land owned by Velma. The chapel was completed on October 1, 1955. On November 14, 1956, a survey having been completed, Velma conveyed to Soldiers Chapel title to the 6.92-acre tract upon which the memorial chapel had been built. The value of the real estate conveyed was $15,000.

Nelson consulted his accountant at the end of each year starting in 1955 and was advised as to the amount which he could deduct for income tax purposes as charitable contributions for the year. Based on this information Nelson credited certain amounts on the back of the note which had been signed by Onstad and Howard and claimed deductions for charitable contributions to Soldiers Chapel on his tax returns for the years 1955 through 1959 accordingly. The back of the note showed the following:

Canceled by gifts by Nelson Story III—

| | |
|---|---|
| $8,000 | 12/31/55 |
| $8,900 | 12/31/56 |
| $6,200 | 12/31/57 |
| $6,100 | 12/31/58 |
| $9,350 | 12/31/59 |

Nelson told Howard and Onstad about this action and the amounts he credited on the principal of the note at the end of each year.

On October 18, 1960, Onstad executed, as president of and on behalf of Soldiers Chapel, a demand note in the face amount of $37,269.68, payable to Nelson, and also a mortgage on the 6.92-acre tract securing payment of the note. Both the mortgage and the note were backdated November 14, 1956. The $37,269.68 face amount of this note was arrived at by deducting $8,000, representing the amount shown credited on the first note as of December 31, 1955, from the principal amount of $45,269 recited in the original note.

It was intended by all concerned that the second note and the mortgage be given Nelson when Velma donated the 6.92-acre tract to Soldiers Chapel in November 1956, and the fact that such was not done until October 1960 was due to oversight.

During the years 1955 through 1960 the income of Soldiers Chapel, consisting of rentals, collection plate, mite boxes, and memorials collected at dedication, exceeded its expenditures during that period by a total of $140.61.

Petitioners, on their joint returns for 1955, 1956, 1957, and 1958, claimed deductions for contributions to Soldiers Chapel in the following respective amounts: $8,000, $8,900, $7,727.86, and $6,237.72. Respondent determined that petitioners made contributions to Soldiers Chapel in the years 1955, 1956, and 1957 in the following amounts: $45,194.68 in 1955, $19,279.39 (being the $15,000 value of the land donated by Velma in 1956 plus $4,279.39 cash donated by Nelson) in 1956, and $1,527.86 (additional cash donated by Nelson) in 1957. Respondent determined that petitioners' total charitable contributions in 1958 did not exceed $533.

ULTIMATE FINDINGS OF FACT.

The note given Nelson in 1955 covering his advances for construction of the chapel, and the note and mortgage backdated November 14,

1956, substituted therefor in 1960, evidenced a valid obligation from Soldiers Chapel to Nelson.

Nelson did not intend to make a gift in the year 1955 of the entire $45,194.68 advanced to Soldiers Chapel in 1955.

Nelson intended to and made gifts to Soldiers Chapel in the amounts of $8,000 in 1955, $8,900 in 1956, $6,200 in 1957, and $6,100 in 1958 by crediting those amounts on the obligation due him by Soldiers Chapel in those years, respectively.

### OPINION.

Respondent, now conceding that Soldiers Chapel is a "church" within the purview of section 170(b)(1)(A) for purposes of computing the percentage limitations on petitioners' charitable deductions for the taxable years here involved, has determined that Nelson made a completed gift to Soldiers Chapel in 1955 in the amount of $45,194.68, that no debt from the corporation to him in that amount arose in 1955, and that petitioners are not entitled to deductions for subsequent years for contributions represented by Nelson's cancellation of portions of the purported debt. Petitioners maintain that Nelson did not make a completed gift to Soldiers Chapel of $45,194.68 in 1955 but only loaned that sum to the corporation which was thereafter indebted to him for that amount, as evidenced first by a note dated May 6, 1955, payable to Nelson in the amount of $45,269, and later by a substitute note and mortgage dated November 14, 1956, but executed October 18, 1960, payable to Nelson in the amount of $37,269.68. Petitioners claim Nelson canceled portions of the debt by crediting, on the back of the appropriate note, the amounts of $8,000 in 1955, $8,900 in 1956, $6,200 in 1957, and $6,100 in 1958. Petitioners claimed charitable deductions in the years 1955, 1956, 1957, and 1958 based on these credits. We are of the view that petitioners, by the overwhelming weight of the evidence, have proved that they are entitled to the deductions claimed.

Of course, a gift or contribution to a qualified organization may be made in property and be the basis for a deduction authorized by section 170, and respondent does not argue that if there was a debt from Soldiers Chapel in Nelson's favor, he could not have made gifts or contributions to the organization in 1957 and 1958 by canceling portions of the debt.[3] Nor does respondent contest the principle that

---

[3] In Rev. Rul. 58-262, 1958-1 C.B. 143, respondent has recognized that a taxpayer does not make a contribution to a church merely by purchasing its building bonds "since the purchaser clearly receives something of value in return for payment of the purchase price," but that he does make a deductible contribution by virtue of subsequent donations of the bonds to the church. In this ruling it was said: "In order for a contribution to be deductible under the provisions of section 170 of the Code, it must * * * be made without any consideration or benefit coming to the donor by reason of making the contribution."

a taxpayer can spread contributions over a period of several taxable years to take fullest advantage of the deductions allowable by the provisions of section 170.[4] Rather, respondent argues that petitioners intended to and made a completed gift of the entire $45,194.68 in 1955 when they advanced the money, and that no true indebtedness was created in 1955 which petitioners could forgive in that and subsequent years.

With respect to respondent's first point, we would have to ignore the testimony of all the witnesses, as well as the note itself, to find that petitioners intended to make a gift of the entire amount in 1955. We find no justification for doing so. We have based our Findings of Fact on the stipulated facts and a consideration of all the evidence presented, including the oral testimony of Nelson, Reverend Onstad, Howard, and Roy Keister, the attorney for Soldiers Chapel who organized the corporation, drafted all the pertinent legal documents, and advised the incorporators and officers of the corporation on legal matters, these being the only witnesses presented at the trial. Our conclusions from this evidence are reflected in our Findings of Fact and they are dispositive of respondent's first point. The fact that Nelson indicated he would probably not collect on the note and would cancel portions of it from time to time if business conditions continued to be good, and the fact that the officers and incorporators of Soldiers Chapel did not think they would be called upon to pay the note, do not support a conclusion that Nelson intended to make a completed gift of the entire amount in 1955 or that any of the parties considered it a completed gift in that year. We think the testimony of the witnesses and their actions thereafter prove to the contrary, and we have so found.

Respondent also argues that no true obligation on the part of Soldiers Chapel to repay the amount advanced by Nelson arose in 1955; consequently, Nelson lost all dominion and control over the money advanced in 1955 and gave nothing by canceling portions of the principal of the note at the end of 1955 and in subsequent years. The notes, on their faces, evidenced a binding obligation to pay a sum certain, and there is no evidence upon which to conclude that they were without consideration, invalid, unreal, or otherwise than what

---

[4] Respondent ruled in Rev. Rul. 58–261, 1958–1 C.B. 143, that a taxpayer, conveying an undivided two-fifths interest in realty in 1956 to a qualified organization, is entitled to a deduction therefor measured by the fair market value of the two-fifths interest. In the ruling it was noted that "it is the intention of the taxpayer to make a gift to the same organization of the remaining undivided three-fifths interest in the property, a part thereof to be so conveyed in 1958 and the remainder in 1959, although he is in no way obligated to do so." It was further ruled that he would be entitled to a deduction under section 170 when he makes a gift of all or a part of the remaining three-fifths interest.

In *Mustard* v. *United States*, 155 F. Supp. 325 (Ct. Cl. 1957), it was assumed that taxpayer could make a charitable contribution of a one-tenth interest in a promissory note of which he was the holder, in each of 2 years.

they purported to be. So far as we can determine they were valid negotiable instruments, however collectible they might have been. The mere fact that the original payee indicated he might or might not attempt to collect on the notes, or that he might forgive all or portions of them in the future, makes the notes no less binding obligations until the events occurred which would relieve the obligation. The evidence indicates that petitioners had a good reason other than for gift tax purposes for advancing the money in the form of a loan rather than an outright gift and demanding the notes as evidence of the indebtedness. Petitioners' primary objective was to create a memorial for their son and the notes gave them some measure of influence and control to see that the chapel was operated in a manner they thought fitting.

Respondent points to the fact that the income of Soldiers Chapel only slightly exceeded its expenditures from 1955 through 1960 and argues that this, coupled with the fact that the corporation had no other assets, requires the conclusion that the parties never intended to create a true debt. The facts do not support the argument. In addition to the chapel itself, the corporation owned the land contributed by Velma, which had a value of $15,000, and some other assets contributed by others. In addition, the evidence indicates that had it been necessary to pay off the note, the funds could have been raised from contributions by interested citizens. Were all charitable organizations required to exhibit operating statements for the past sufficient to permit amortization of construction loans in the future there would be far less churches, hospitals, and other charitable structures in this country than there are now.

Furthermore, the question here is not whether petitioners intended to collect the debt, but whether they intended to make a gift of the amount advanced when it was advanced, or to create an obligation portions of which could be forgiven from time to time as gifts in the future. We think the latter was the case here. And we see no reason why a taxpayer cannot advance money to a charity when it is needed and arrange the transaction in such a manner that he can take full advantage of the charitable deduction provisions of the income tax statutes over a period of years, provided he does not actually part with all dominion and control over the property contributed at the time it is advanced, and truly intends to make a contribution of the property advanced over a period of years rather than all at one time.

Respondent relies heavily on the opinion of the Board of Tax Appeals in *John E. Andrus, Jr.*, 15 B.T.A. 479 (1929), revd. 50 F. 2d 332 (C.A.D.C. 1931). That case is readily distinguishable because there it was found that there was not sufficient evidence in the record to convince the Board that it was not the purpose and intention of the taxpayers to make an outright gift of the land conveyed at the

time of the conveyance. *Minnie E. Deal*, 29 T.C. 730 (1958), also relied on by respondent, is likewise factually distinguishable. The other cases cited by respondent, concerned mostly with deductions for bad debts, are inapposite.

In order to reflect concessions made by the parties,

*Decision will be entered under Rule 50.*