LEWIS C. CHRISTENSEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 92529. Filed June 21, 1963.

*Kneeland A. Godfrey* and *Robert J. Davidson*, for the petitioner.
*William J. Wise*, for the respondent.

DAWSON, *Judge:* Respondent determined the following deficiencies in the income tax of petitioner:

| Year | Amount |
|------|--------|
| 1956 | $7,859.92 |
| 1957 | 10,642.41 |
| 1958 | 11,919.15 |

Certain adjustments were either not put in controversy by the petition or have been conceded by the parties in the stipulation of facts. The principal issue is whether the petitioner, Lewis C. Christensen, is entitled to charitable deductions under section 170, I.R.C. 1954, for amounts credited in 1956, 1957, and 1958 to accounts established by him on his books for the North Cape Lutheran Church and the Danish Old Peoples Home, such amounts having been paid to the organizations in 1961. A subsidiary and related question is whether the petitioner is entitled to interest deductions in the same years for amounts credited to the accounts of the two organizations but not paid in those years.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference.

<em>General</em>

Lewis C. Christensen (hereinafter referred to as petitioner) resided at 1018 Orchard Street, Racine, Wis., during the years 1956, 1957, and 1958. He kept his books and filed his Federal income tax returns on the cash basis of accounting. His individual income tax returns for each of these years were timely filed with the district director of internal revenue, Milwaukee, Wis.

In his returns the petitioner claimed deductions for charitable contributions made to the North Cape Lutheran Church and the Danish Old Peoples Home as follows:

|  | 1956 | 1957 | 1958 |
|---|---|---|---|
| North Cape Lutheran Church | $2,000 | $3,000 | $2,000 |
| Danish Old Peoples Home | 7,000 | 7,000 | 7,000 |

Respondent disallowed the claimed deductions "because it has not been established that such amounts have been paid within the meaning of section 170."

The petitioner also claimed these interest deductions:

|  | 1956 | 1957 | 1958 |
|---|---|---|---|
| North Cape Lutheran Church | $308.58 | $377.84 | $479.18 |
| Danish Old Peoples Home | 1,072.39 | 1,314.56 | 1,564.00 |

None of the interest amounts were paid to the organizations in these years and respondent disallowed them "because it has not been established that such amounts represent interest on a bona fide indebtedness and that such amounts have been paid within the meaning of section 163."

Petitioner, a leading citizen in his community, is 79 years of age. For over 50 years he has been engaged in the real estate and investment business in Racine. It consists of acting as a real estate broker and investing money for or finding suitable investments for other persons. The usual practice in the investment phase of his business is for a potential investor to bring a sum of money to his office and request that it be invested. When a customer comes to petitioner with funds to invest, he allows the customer to inspect a list of properties with mortgages available and, if requested, to inspect the properties themselves. When the amount invested is sufficient to fit a mortgage, then a mortgage is assigned to the investor and the assignment recorded with the documents sent to him. Whether or not mortgages are assigned, the money is payable on demand, even though short-term mortgages draw a lesser rate of interest. During the years 1956 through 1958 petitioner was paying 4 percent per annum semiannually to persons who had invested in first mortgages with him, which amount represented the return on the mortgage less a 1-percent service charge.

If an investor has a sufficient sum of money to match a mortgage which petitioner has in his inventory, a mortgage is assigned but the assignment is not recorded. If the amount is not large enough, several general accounts are collateralized by one or more mortgages.

Since 1946 the petitioner has had more than 100 investment accounts of other persons in his office. Ledger sheets were maintained for these investment accounts. All entries on the ledger sheets were made in the regular course of business by employees who were under the general supervision and direction of petitioner. Each transaction shown on the ledger sheets was made on the date indicated thereon.

The following ledger sheet is a typical account maintained by petitioner where a mortgage was assigned to an investor:

CoL LCC INVESTMENT CORP         DEP. HELD FOR INV. REG

GENERAL LEDGER

215                                      Page

Name   HANSCHE BEN

July–Jan–

Interest on 20,000.00 at 5%–

| Description | Debits | Credits | Date | Balance |
|---|---|---|---|---|
| INVESTMENT FOR BEN HANSCHE | | 20,000.00 | JUL 3 62 | 20,000.00 CR |
| PURCH ROY HUDSON MTG NET 5 PER CENT | 8,282.75 | | | |
| PURCH ROBERT PFAFF MTG NET 5 PER CENT | 5,500.00 | | | |
| PURCH CHAS. CALLOW MTG NET 5 PER CENT | 5,525.84 | | JUL 3 62 | 691.41 CR |
| CK 613 ON ACCOUNT | 7,500.00 | | NOV 6 62 | 6,808.59 ** |
| ASSIGN. BACK TO CORP MTG REG. OFF OF COLL. ROY HUDSON MTG. | | 8,282.75 | NOV 6 62 | 1,474.16 CR |
| CK 699 ON ACCOUNT | 5,000.00 | | DEC 5 62 | 3,525.84 ** |
| ASSIGN BACK TO CORP MTG REG OFF OF COLL. CHARLES CALLOW MTG | | 5,525.84 | DEC 4 62 | 2,000.00 CR |
| CK 787 BEN HANSCHE BAL ACCT. | 7,500.00 | | DEC 26 62 | 5,500.00 ** |
| ASSIGN BACK TO CORP MTG REG OFF OF COLL R PFAFF MTG | | 5,500.00 | DEC 31 62 | .00 ** |

As reflected in financial statements submitted to the First National Bank and Trust Co. of Racine, the petitioner's net worth on January 1, 1956, was $872,568.70 and on December 31, 1957, was $937,685.24. These financial statements do not show any liability to either the North Cape Lutheran Church or the Danish Old Peoples Home.

During the years 1956 through 1958 the petitioner maintained personal checking accounts in the First National Bank and Trust Co. and the West Racine Bank. In addition, he also maintained trust accounts. As to these, petitioner could only withdraw the money as trustee and the banks would not honor a check otherwise drawn. The same was true with respect to petitioner's general trust account at the West Racine Bank. All of these trust accounts were restricted by fiduciary duty. He did not maintain any separate bank account, trust or otherwise, for either the North Cape Lutheran Church or the Danish Old Peoples Home during these years.

All moneys in the personal checking accounts were under the absolute and unfettered control of petitioner and were used by him to pay personal bills such as food and entertainment as well as business expenses. At times the balances in these personal checking accounts were insufficient to cover the balance shown on the ledger sheets in the name of the North Cape Lutheran Church and the Danish Old Peoples Home. However, at all times, the petitioner's assets greatly exceeded the amounts shown to be due on these ledger accounts.

Both the North Cape Lutheran Church and the Danish Old Peoples Home are organizations to which deductible charitable contributions can be made and are described within the provisions of section 170(c) of the Internal Revenue Code of 1954.

Neither the North Cape Lutheran Church nor the Danish Old Peoples Home were afforded any of the rights and benefits of regular investors with respect to the amounts claimed as charitable contributions by petitioner.

There were no written or oral agreements between petitioner and these two organizations regarding the creation of trusts.

### North Cape Lutheran Church

For most of her life the petitioner's first wife had been a member of the North Cape Lutheran Church (sometimes referred to as the church). The petitioner attended the church from time to time. Just prior to 1946, his wife spoke to him about the church's financial

condition, particularly mentioning the fact that there was no parsonage for its minister. Shortly before, the petitioner had advised certain members of the church that, in his opinion, it could support a minister of its own and cease sharing one with another congregation.

The church was located on the east side of Highway No. 59. Constructed in 1883, it was an old building without inside plumbing and badly in need of repair and remodeling. It was completely surrounded by a cemetery and had no available parking area. However, the church owned another site directly across on the west side of the highway. In 1956 it was decided to move the church to that site and remodel it. The total cost of the project was $76,000, of which it was necessary to borrow $50,000 from the Bank of Franksville. The church also owned land adjoining this site, known as Skairie Woods, and a parsonage approximately 2½ miles away. Sometime before 1946 the petitioner had offered to give the church a farm site to be used for a parsonage. But since it was some distance from the church his offer was refused.

On December 31, 1946, the petitioner directed that a general ledger account be established, headed "North Cape Lutheran Church", which was similar to those used for regular investment accounts. The amount of $1,000 was credited to this ledger account and inscribed thereon was this notation:

Donation from L. C. C. to draw interest at 3 per cent to be paid when parsonage is built in Skairie Woods across from Church.

On the same date, at petitioner's direction, a check in the amount of $1,000 was drawn on the Bank of Franksville payable to the church. Appearing on the face of the check was the word "donation." The check was not delivered to any official of the church. It was drawn on petitioner's personal checking account, endorsed "Cr. to Acct. North Cape Lutheran Church Bldg. Fund," and deposited in and cleared through the same personal checking account. Very soon thereafter, the petitioner informed Hugo Schattner, then the treasurer of the church, of this transaction. He told Schattner the funds would be available for the purpose of building a parsonage at the location known as Skairie Woods.

Pertinent information with respect to amounts credited to this general ledger account in the name of "North Cape Lutheran Church" is as follows:

| Date amount credited to ledger account | Date check drawn | Principal | Interest [2] | |
|---|---|---|---|---|
| Dec. 31, 1946 | Dec. 31, 1946 [3] | $1,000 | | |
| Dec. 10, 1950 | none | | $200.00 | |
| Dec. 31, 1951 | Dec. 31, 1951 | 2,000 | 36.00 | |
| Dec. 31, 1952 | none | | 97.08 | |
| Dec. 23, 1953 | Dec. 23, 1953 | [4] 5,000 | | |
| Dec. 31, 1953 | Dec. 24, 1953 | 500 | 99.99 | |
| Dec. 24, 1954 | Dec. 23, 1954 | 300 | | |
| Dec. 31, 1954 | none | | 268.00 | |
| Dec. 31, 1955 | none | | 285.03 | |
| Jan. 10, 1956 | Dec. 28, 1955 | 500 | | |
| Dec. 31, 1956 | Dec. 31, 1956 | 2,000 | 308.58 | |
| Dec. 31, 1957 | none | 3,000 | 377.84 | |
| Dec. 30, 1958 | Dec. 13, 1958 | 2,000 | | |
| Dec. 31, 1958 | none | | 479.18 | |
| Dec. 22, 1959 | Dec. 19, 1959 | 3,000 | | |
| Dec. 31, 1959 | none | | 553.35 | |
| Dec. 15, 1960 | none | | 660.16 | |
| Dec. 27, 1960 | Dec. 24, 1960 | 3,000 | | |
| Oct. 17, 1961 | none | 2,459.63 | 615.96 | |
| Total | | $24,759.63 | $3,981.37 | $28,741.00 |

[1] Checks were payable to the church, drawn against petitioner's personal checking account in either the West Racine Bank or the First National Bank and Trust Co., and in due course were endorsed "Cr. to Acct. of North Cape Lutheran Church, Payable to Order of L. C. Christensen," and deposited in and cleared through his personal account.
[2] No checks were drawn covering any interest credited to the ledger account.
[3] Check drawn on Bank of Franksville.
[4] Check signed by L. C. Christensen was in the amount of $1,666.66.

Except for the *principal* amounts credited on December 31, 1957 December 30, 1958, and December 27, 1960, the petitioner would on each occasion write a letter to the church informing it of the additional *principal* sums credited to the ledger account. His letters would be acknowledged by a designated church official with an expression of appreciation. Frequently the petitioner would indicate in his letters to the church the balance then existing in the fund. For example, his letter to the Reverend Glen Vanderbilt dated December 10, 1953, stated:

We have credited and placed in Trust for your church to be used for the building of a new parsonage in the wooded lot across from the church the sum of $5,000. As you probably know, several strong supporters of that project and I believe that that is where the parsonage should be located. In other words, I think parsonage and church should be closely located. This $5,000 is a donation from the writer, my son Norman W. of Franksville and my son Harold K. of Abbotsford. This is given in memory of their mother and my dear wife and has been set aside as above stated.

His letter of December 24, 1959, to Frank Smerchek, president of the church, reads, in part, as follows:

It again gives me great pleasure to add another $3,000.00 to the trust account due your Church for the building of a new parsonage in the woods directly

south of your Church. Your Treasurer, Nelson Johnson knows the total amount.

\* \* \* \* \* \* \*

All investments in our trust account draw 3% interest annually. These gifts that have been made by myself and my sons are in memory of my beloved wife Bertha and her parents who were members of your Church for more than fifty years. It is a real pleasure to make these donations, not alone to the Church in the locality where my wife and her folks were, but also with respect to the community where I got my first start. I worked for John Henry Braund on the farm where your Church now stands at 25¢ a day and got my first business experience in the Andrewson General Store at North Cape. I have much to be thankful for to the Almighty, and my many friends in your community and I love them all.

These transactions were also variously reported to the annual congregational meetings of the church.

Prior to 1959, the year in which the revenue agent's examination began, the petitioner did not exhibit either the ledger sheet or the checks to anyone connected with the church. However, after that time, the petitioner obtained the endorsement of the responsible officer of the church before the check was deposited in his personal account, because, as he testified, he wanted to make the "evidence" in support of his tax deductions "stronger."

The ledger account maintained for the church shows no assignments of mortgages. However, an unrecorded assignment of a mortgage was made to the church on December 29, 1958, but it was never delivered.

The amounts credited to the ledger account in the name of "North Cape Lutheran Church" were never shown on the books or annual statements of the Church until 1961 when on October 17 of that year the sum of $28,741 was debited to the account and a check drawn on the West Racine Bank, payable to the North Cape Lutheran Congregation, and signed by L. C. Christensen, was delivered to Nelson H. Johnson, the church treasurer. The check was cashed by the church and deposited in a special account in the Bank of Elmwood. This amount provided the funds necessary to pay for the new parsonage.

### Danish Old Peoples Home

Before the end of 1952, the petitioner was approached by a retired gentleman, Fred Helding, who wished to find a place for himself and his wife to live for the rest of their lives. After encountering considerable difficulty in finding a place for them, the petitioner approached Peter Brown, then treasurer of the Danish Old Peoples Home (sometimes referred to as the home). Petitioner finally secured a place for the Heldings in the home. It was then that he began thinking about the problems of elderly people and the necessity of having suitable quarters for them.

Prior to December 1951, the home had been a regular customer of petitioner and had amounts invested with him from time to time. These funds were secured by mortgages and held in trust accounts.

On December 27, 1952, the petitioner drew a check in the amount of $10,000 on the First National Bank and Trust Co. of Racine to the order of the home. This check was subsequently debited and credited to petitioner's personal checking account, having been endorsed in this manner:

Credit to account of Danish Old Peoples Home
Pay to order of First National Bank and Trust
Company of Racine
For deposit only
L. C. Christensen

On December 31, 1952, a general ledger account in the name of the "Danish Old Peoples Home" was opened on the petitioner's books. The following notation appeared on the general ledger account:

Donations set aside by L. C. Christensen to draw interest at 3 percent per annum for the building of a new addition to the Danish Old Peoples Home in memory of Col. L. C. Christensen

On the same date, the sum of $10,000 was credited to the account, and the petitioner informed Peter Brown of the creation of this account. He requested that Brown keep information regarding the account in strictest confidence.

Pertinent information with respect to amounts credited to the general ledger account in the name of the "Danish Old Peoples Home" is set forth below:

| Date amount credited to ledger account | Date check drawn [1] | Principal | Interest [2] |
|---|---|---|---|
| Dec. 31, 1952 | Dec. 27, 1952 | $10,000.00 | |
| Dec. 31, 1953 | Dec. 24, 1953 | 10,000.00 | $300.00 |
| Dec. 24, 1954 | Dec. 23, 1954 | 7,000.00 | |
| Dec. 31, 1954 | none | | 609.00 |
| Dec. 31, 1955 | none | | 837.27 |
| Jan. 10, 1956 | Dec. 28, 1955 | 7,000.00 | |
| Dec. 31, 1956 | Dec. 31, 1956 | 7,000.00 | 1,072.39 |
| Dec. 31, 1957 | none | 7,000.00 | 1,314.56 |
| Dec. 24, 1958 | Dec. 13, 1958 | 7,000.00 | |
| Dec. 31, 1958 | none | | 1,564.00 |
| Dec. 22, 1959 | Dec. 19, 1959 | 7,000.00 | |
| Dec. 31, 1959 | none | | 1,820.92 |
| Dec. 15, 1960 | none | | 2,085.54 |
| Dec. 27, 1960 | Dec. 12, 1960 [3] | 7,000.00 | |
| Sept. 8, 1961 | none | | 1,572.08 |
| Total | | $69,000.00 | $11,175.76    $80,175.76 |

[1] The checks were payable to the home, drawn against petitioner's personal checking account in either the West Racine Bank or the First National Bank and Trust Co., and in due course were endorsed "Credit to Account of Danish Old Peoples Home, L. C. Christensen," and deposited in and cleared through his account.
[2] No checks were drawn covering any interest credited to the ledger account.
[3] Endorsed by the Danish Old Peoples Home and credited to petitioner's personal checking account.

Except for the *principal* amounts credited to the general ledger account of the home on December 24, 1953, and December 12, 1960, the petitioner wrote a letter each time to Peter Brown informing him of the additional principal sums credited. For example, his letter of December 23, 1954, stated:

I am writing this letter confidentially to you as Treasurer of the Danish Old Peoples Home. I want to tell you that we have added another $7,000 to the sum that is in Trust at our office to be used for building an addition to the Danish Old Peoples Home at the proper time and when there are ample funds for same. I want you to have a record of this. In Trust at the present time including this $7,000 is $27,300. We do not want this publicized, but I do want you to have something so that you will know it is here. When you and myself, or my successor Trustee, decides it is the proper time to build the addition, this sum will be available which has been set aside from time to time.

The petitioner's letter of January 9, 1956, to Peter Brown reads, in part, as follows:

Here is another confidential letter to you as Trustee of the Danish Old Peoples Home. I have added an additional $7,000 to the fund set up for the building of a new addition to the Danish Old Peoples Home on Milwaukee Avenue which makes a total of $35,746.27.

Finally, on September 8, 1961, the petitioner drew a check on the West Racine Bank in favor of the Danish Old Peoples Home in the amount of $80,175.76. The general ledger account was then debited and closed out. This represented the first time that any sum was actually transferred out of petitioner's personal checking account. The $80,175.76 provided a substantial part of the cost ($110,000) for the additional wing to the home. The remainder was provided from the general funds of the home.

No assignments of mortgages were shown on the general ledger account of the home. However, two unrecorded assignments of mortgages to the Home as a guarantee for money in the account were executed on May 14, 1959, and April 15, 1961.

The general ledger account was first shown by petitioner to Peter Brown in 1958. At petitioner's request Brown did not reveal this fund to others until 1958 or 1959, when members of the board of directors of the home were informed of it. The reason given for this was that the petitioner did not wish to have all of the members of the board know of the fund for fear he would be deluged by other requests for charitable gifts. Until the revenue agent questioned the charitable contributions the petitioner never did any more than communicate his ledger entries to Peter Brown. Prior to 1959 the petitioner did not exhibit either the checks or the general ledger account to anyone connected with the home.

The amounts claimed as charitable contributions by the petitioner were never shown on the books or annual statements of the home until 1961 when the money was actually received.

OPINION

Petitioner contends that he created valid, irrevocable trusts for the North Cape Lutheran Church in 1946 and for the Danish Old Peoples Home in 1952 and made payments thereto in the taxable years 1956, 1957, and 1958. Yet he concedes that none of the amounts involved herein were *actually paid* to either organization in those years. As we view it, his basic position is that the ledger account entries communicated to the organizations were sufficient to qualify the amounts as deductible charitable contributions under the applicable provisions of section 170, I.R.C. 1954.[1] The crux of this position is that he made *gifts in trust* to both organizations.

Respondent counters initially with the argument that there were no trusts for lack of a subject or res. Secondly, even assuming there were trusts under Wisconsin law, respondent says the petitioner has not parted with anything which would constitute "payment" under section 170 (a) during the years in controversy. He concedes, however, that if petitioner is entitled to charitable deductions for such amounts, it is in 1961 when they were paid to the organizations.

To begin with, we seriously doubt whether petitioner's acts created a trust, primarily because mere ledger account entries coupled with letters written to the charitable organizations were not sufficiently specific to afford them a cause of action even if there were a res. But we think the lack of *specific, identifiable* property here is such a glaring omission as to preclude a trust in any event. See 1 Scott, Trusts, secs. 74, 76; 1 Bogert, Trusts and Trustees, secs. 111–116 and cases cited therein. Nothing was set aside. There were no "trust" accounts in a legal sense. Funds which could have been used to pay the amounts credited to the ledger accounts were at all times commingled with other money in the petitioner's personal checking accounts. Although he states that the "terms of the trusts" required investment with him, there is no evidence of any terms requiring anything and the officials connected with the church and the home had no idea what petitioner was doing with the money.

Two Wisconsin cases are cited in support of petitioner's contention that valid trusts were created when he credited the ledger ac-

---

[1] SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

   (a) ALLOWANCE OF DEDUCTION.—

      (1) General Rule.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * *

      *      *      *      *      *      *      *

   (c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

      *      *      *      *      *      *      *

      (2) A corporation, trust, or community chest, fund, or foundation—

      *      *      *      *      *      *      *

       (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;

counts on his books. The first is *Wyse* v. *Puchner*, 260 Wis. 365, 51 N.W. 2d 38 (1951). There the court found that the settlor had put aside $5,000 received from the sale price of her mother's apartment building as a trust fund. While it is not exactly clear from the facts how or where the $5,000 was set aside, there appears to be no argument over that, and the trial court had found as a fact that the $5,000 was truly set aside. In *Estate of Horkan*, 193 Wis. 286, 214 N.W. 438 (1927), the second case, the court noted that it was a situation involving a contest over specific personal property, namely a $5,000 note of the Mauston Electric Co. The court found that the decedent's acts and the fact that the note was executed in the daughter's name were sufficient to constitute a trust. It distinguished the cases of *Ambrosius* v. *Ambrosius*, 239 Fed. 473, and *Eschen* v. *Steers*, 10 F. 2d 739, where the alleged settlor was held to have retained such dominion over the funds involved as to prevent the creation of a trust. One thing is clear. Neither of these cases stands for the proposition that Wisconsin does not follow the general law of trusts. In fact, in a case where the Supreme Court of Wisconsin had occasion to discuss the property aspect of trusts, *Warsco* v. *Oshkosh Savings & Trust Co.*, 183 Wis. 156, 196 N.W. 829 (1924), the settlor, unlike the petitioner here, had purported to set a specific sum aside for the beneficiary, though retaining complete control over its disposition. The court found no trust, stating:

But there must be an alienation of the donor's property constituting the trust to the trustee and under such terms that when the trust is executed a benefit accrues to a *cestui que trust* unless prevented by a condition subsequent resulting from a lawful revocation of the trust. If the donor has full control and dominion over the trust property, so that according to the terms of the trust he can use it as and when he pleases, the trustee becomes his mere agent to hold title to the property, invest, sell, and collect income for him and pay as he directs. The donor has parted with no dominion over his property nor any part thereof by the terms of the trust, and such an agreement is no valid trust agreement.

The petitioner in this case did not even go so far as to set aside specific property. If he had died or become insolvent there would have been nothing specific for the organizations to look to and the tracing, which is inherent in a trust relationship, would have been impossible.

Even if we were to find that valid trusts were created, which we cannot do on this record, the petitioner would still be unable to avoid the overriding requirement of payment which pervades the statute and thus disqualifies the deductions. It seems clear from the legislative history of section 170(a)(1) that Congress intended to require actual payment as a prerequisite to the deduction of a charitable contribution or gift. See concurring opinion in *Norman Petty*, 40 T.C. 521 (1963). The words "payment of which was made in the taxable year" were added to the statute by the enactment of section

23(o), Revenue Act of 1938. The committee reports with respect to this change are illuminating.[2] Moreover, since the passage of the Revenue Act of 1938, the income tax regulations have consistently required that a charitable contribution be *actually paid* before the deduction can be taken, regardless of the taxpayer's method of accounting.[3]

The phrase "payment of which is made within the taxable year" in section 170(a) modifies and controls the phrase "to and for the use of" in section 170(c) since subsection (c) is specifically incorporated in subsection (a). Consequently, there must be a payment into a charitable trust before the deduction can be allowed. This contemplates placing the funds beyond the taxpayer's control. Here the petitioner did not part with anything until 1961. His assertions to the contrary fly in the face of the plain statutory language. It is readily apparent from the legislative history of this section that Congress was interested in safeguarding against possible abuses of the very nature which would exist if this petitioner were to prevail.

In *Estate of Modie J. Spiegel*, 12 T.C. 524 (1949), we discussed the meaning of the word "payment" in the predecessor of section 170. While holding that payment included a check which was drawn and delivered to but not cleared by a charitable institution before the close of a taxable year, it was pointed out that the provision had been enacted with the purpose of preventing accrual basis taxpayers from deducting charitable donations not paid, and stated that payment meant at least an unconditional parting with funds, or their equivalent, by the taxpayer. See also *Norman Petty, supra*, holding that a promissory note given without consideration to the Norman Petty Foundation did not constitute a contribution or gift within the meaning of section 170(c) so as to entitle the taxpayer to a deduction for a charitable contribution in the year the note was given.

The evidence contained in the stipulation of facts and introduced by respondent through the banks' officers establishes that the "checks"

---

[2] See H. Rept. No. 1860, 75th Cong., 3d Sess., p. 19 (1938), which states:

Under the various revenue acts the deduction for contributions is allowed for the taxable year in which the contribution is made. Hence, a taxpayer on an accrual basis of accounting may claim that he is entitled to a deduction for the amount of a charitable pledge in one year, although he does not actually pay it until a later year, or indefinitely postpones payment. The doubt and confusion in such cases is aggravated by reason of the uncertainty and diversity in the law of the various States on the question as to when the liability of a subscriber to a charitable fund is fully incurred. In the interest of certainty in the administration of the revenue laws, it is desirable to dispel this confusion by enacting a clear and uniform statutory rule to govern this situation.

The bill provides that the deduction for contributions or gifts for charitable and other purposes shall be allowed only for the taxable year in which the contribution is *actually paid* regardless of whether the taxpayer is reporting income on the cash or the accrual basis. The allowance of the deduction in the year when *actually paid* will provide a clearer rule without hardship to the taxpayer and will eliminate the uncertainty in the administration of the deduction. * * * [Emphasis supplied.]

[3] Sec. 23(o)–1, Regs. 103; and sec. 1.170–1(a), Income Tax Regs.

written by petitioner cleared into and through a common fund maintained by him as his personal accounts in the banks. These checks were a nullity and were admittedly used only for bookkeeping purposes. The inference we draw is that petitioner did not want to preclude himself from using such fund for any purpose he wished. Though contending that a liability to the organizations existed, the petitioner showed no liability on his financial statements and in theory benefited his credit standing with money he supposedly placed in trust. Furthermore, the annual reports and statements of the two charitable organizations did not reflect receipt of anything until 1961. And Peter Brown, the treasurer of the Danish Old Peoples Home, testified this was so because "It wasn't given to us. We didn't have the money."

This case is factually similar to *Nehring* v. *Commissioner*, 131 F. 2d 790 (C.A. 7, 1942), affirming 45 B.T.A. 1111 (1941). While that decision may not completely control the instant case, it is sufficiently analogous to justify summarizing what happened. It involved the years 1936 and 1937, which were prior to the enactment of the payment requirement. Paul Nehring was a prominent member of his church and the only likely source of funds for building a new church. He communicated his intent to a church official to make certain donations and proceeded to credit the church account on his corporation's books and charge the corporation with the amount credited. The same was done with the taxpayer's individual account. Each "donation" was communicated to the pastor. The personal accounts of the individuals on the corporate books and the bank account of the corporation were at all times sufficient to cover the amounts credited to the church. There, as here, the amounts were actually paid in a subsequent year and respondent was contending that deductions should be taken in the year paid. While the Nehrings did not argue the trust theory, their theory was almost as ingenious. They argued that their acts in transferring from the corporate and individual accounts to the account of the church constituted parol assignments of accounts receivable or credits sufficient to complete the gifts in the years claimed. We held that the acts amounted to no more than pledges without consideration which could have been countermanded at any time. This factor is also present in the instant case. We further stated that the Nehrings had not relinquished their right to exercise dominion over the funds and that their acts were not sufficient to vest in the church the contemplated gifts. Noting that the authorities cited did not support the taxpayers' theory because they involved the assignment of funds to third parties, the court of appeals said:

The acts or transactions of the parties were not unlike those of a person taking money from one pocket and placing it in another for a special purpose. Until

used for such purpose, it remains his money, subject to his control and dominion, and he can do with it as he pleases.

In our view, the most that can be said for the acts of the parties in transferring on their own books credit from their corporate and individual accounts to the church account was to earmark such credit for the purpose of a gift or contribution to the church. Further action, however, was required before the gift was finally consummated, and the action which resulted in such consummation was the actual utilization of this credit for the purpose intended—that is, the construction of the church building. Certainly, the bank account of the corporation was not affected by the assignment of credit upon its books. That took place only when the funds were actually expended, in the form of checks drawn upon such account. Until that time, so we think, petitioners, who had complete control of the corporation, retained the power to revoke the so-called assignments of credit. The corporation, likewise, retained such power. Having failed to divest themselves irrevocably of title and control over the credit earmarked for the church within the taxable years, they were not entitled to the deductions claimed.

Cf. *Nelson Story III*, 38 T. C. 936 (1962) ; *Burroughs Corporation*, 33 T. C. 389, 408 (1959) ; and *Security First National Bank of Los Angeles, Executor*, 28 B.T.A. 289, 312 (1933).

Petitioner argues that since a gift in trust was not made in *Nehring*, it is distinguishable. Nevertheless, we believe such an argument would have failed there, just as it must here, because, as the U.S. Supreme Court said in *Smith* v. *Shaughnessy*, 318 U.S. 176, 181 (1943), "the essence of a gift by trust is the abandonment of control over the property put in trust." There is no doubt this petitioner retained absolute and unfettered control over all the money in his personal checking accounts. In addition, Congress has since enacted the payment requirement of section 170(a) which clearly prevents the deduction of the amounts in question.

We are perfectly satisfied that petitioner acted in good faith. It is obvious from the evidence that he is an individual deeply endowed with a charitable spirit. The testimony of record amply demonstrates what his benevolent intentions were and that they were later carried out. It is unfortunate, however, that he failed to bring himself within the terms of the statute. On the basis of the entire record, we must conclude that no valid trusts were created and no payments were made to the church and the home during the years 1956 through 1958. We therefore find it unnecessary to consider respondent's final contention that the narrow and strict conditions placed on petitioner's promises to these organizations vitiated the deductions under the provisions of section 1–170–1(e), Income Tax Regs.

With respect to the second issue relating to the claimed interest deductions, section 163(a) provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." A taxpayer on the cash basis may deduct accrued

interest only when actually paid. *Oscar G. Joseph*, 32 B.T.A. 1192 (1935). In order for interest to be deductible, it must be paid on an indebtedness, i.e., an existing, valid, and enforceable obligation to pay a principal sum and to pay interest thereon. From what we have said previously, we hold that (1) there was no enforceable obligation and (2) the mere crediting of interest on the ledger accounts maintained for the North Cape Lutheran Church and the Danish Old Peoples Home did not constitute interest paid in the taxable years 1956, 1957, and 1958.

To reflect concessions made by the parties,

*Decision will be entered under Rule 50.*