FRANK M. WINSTON AND JACINTA D. WINSTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Winston v. Commissioner
Docket No. 6374-81.
United States Tax Court
T.C. Memo 1984-248; 1984 Tax Ct. Memo LEXIS 420; 48 T.C.M. (CCH) 55; T.C.M. (RIA) 84248; May 8, 1984. Frank M. Winston, pro se. Pamela Piland, for the respondent. *421 FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $839 in petitioners' 1977 Federal income tax and an addition to the tax under section 6653(a)[1] in the amount of $42.The issues for decision are: (1) Whether petitioners are entitled to a charitable contribution deduction under section 170(a)(1) in the amount of $5,764 based solely on their forgiveness, to that extent, of a portion of a purported debt owed to petitioner Frank M. Winston by his church; and (2) Whether, if we find that petitioners underpaid their taxes for 1977, any part of the underpayment was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). FINDINGS OF FACT At the time they filed their petition in this case, petitioners, Frank M. Winston and Jacinta D. Winston, were husband and wife, and they resided in Los Angeles, California. They timely filed a joint Federal income tax return for 1977, reporting their income on the cash basis. Hereafter we *422 shall refer only to Frank M. Winston as petitioner. 1. Formation of T.O.I.L.
Approximately 20 years ago, petitioner, who was a practicing real estate broker at the time, joined with a small group of business and professional people in the Beverly Hills, California, area in forming an informal real estate investment club. After some years, the club evolved into a philosophical and social group; the members felt they shared consonant views on life, philosophy, and religion. Eventually, the members of the club decided to get involved in a church movement. In 1969, they formed a church, the Temple of the Inspired Living (T.O.I.L.), described as a "worldwide, not for profit, all faiths, spiritual/metaphysical, educational church." They obtained a charter from the State of California to operate the church as a corporation sole. [2]
Petitioner *423 was named Prime Minister of T.O.I.L., a position described by petitioner as equivalent to that of a corporation's executive officer. Church Bishops functioned in an advisory capacity with respect to T.O.I.L.'s activities; as Prime Minister of the corporation sole, however, petitioner had the power to overrule the Bishops. Petitioner has held the position of Prime Minister at all times from 1969 to the date of trial. Since 1969, and continuing to the date of trial, the address and primary place of T.O.I.L.'s worship and business has been 1048 Stearns Drive, Los Angeles, California 90035, the same address as petitioner's personal residence. 2. Financial History of the T.O.I.L.
Throughout its existence, T.O.I.L. never charged dues or assessments to its members; the church operated solely through goodwill offerings from members and friends. T.O.I.L. never had any money, except for a period of approximately 1 year from 1976 to 1977, when T.O.I.L. maintained a bank account at the Crocker National Bank. At one point during 1977, this account had a balance of $4,313, the highest balance ever maintained. The account was funded through contributions made by the church membership *424 for the purpose of financing a bingo operation as a church fund-raising activity. The money in the account was used in T.O.I.L.'s effort to procure a lease of certain premises located in Anaheim, California, which were intended to house the planned bingo operation. T.O.I.L. entered into the lease with an option to purchase the property after 6 months; however, the City of Anaheim denied T.O.I.L.'s application for occupancy of the premises. Thus, T.O.I.L. never exercised the option to purchase the premises; its bingo operation never materialized; and no funds were ever raised from the venture. All of the money in T.O.I.L.'s Crocker bank account was used in furtherance of the failed bingo venture; after its failure, the account was closed. 3. Petitioner's Salary and Clergyman's House Allowance
On December 19, 1976, at a meeting of T.O.I.L.'s Board of Directors, a motion was made and carried by the quorum present to "recommend to the Prime Minister for adoption" the following: That the Prime Minister is authorized to receive a Clergyman's House Allowance for Calendar Year 1977 for all expenditures allowable by law to a maximum [maximum] amount of $18,500.00, *425 but not to exceed actual amounts expended. The motion was qualified by the following language: In the event the Church shall not have sufficient funds with which to pay said authorized allowance, any balance owed shall be cumulative and bear interest at a rate of six percent (6%) annually on the unpaid balance. The motion was presented for adoption to petitioner as Prime Minister of T.O.I.L. Petitioner adopted the motion by subscribing his name to the written motion on December 19, 1976. The Clergyman's house allowance was recommended as a means of compensating petitioner for services rendered by him to the Church as its Prime Minister, and was "in addition to" and "a part" of petitioner's authorized T.O.I.L. salary of $54,000 for 1977. T.O.I.L. had also authorized salaries and housing allowances in favor of petitioner in years prior to 1977. Several other T.O.I.L. officers were authorized to receive salaries similar to petitioner's; however, petitioner, as T.O.I.L.'s Prime Minister, was the only church member authorized to receive a clergyman's house allowance. 4. Petitioner's Household Expenses for 1977
During 1977, petitioner incurred and paid, *426 using his own funds, household expenses totalling $13,257 which included the following: Mortgage Payments
$ 4,642
Property Taxes
1,566
Home Improvement Loan Payment
1,000
Water, Gas, Electric
327
Gardener
240
Pool Maintenance & Repair
135
Depreciation Value, Furniture & Furnishings
2,500
Insurance Coverage
400
Housekeeping Costs
1,200
House Repairs
1,247
Total
$13,257
On his 1977 Federal income tax return, petitioner claimed Schedule A deductions for property taxes in the amount of $1,566 and home mortgage interest expense in the amount of $4,283. During 1977, T.O.I.L. paid petitioner no portion of his authorized T.O.I.L. salary; nor did T.O.I.L. pay petitioner any portion of his authorized clergyman's house allowance in reimbursement of the household expenses which he had paid. Similarly, none of the other church officers authorized by T.O.I.L. to receive salaries received any portion of their salaries. A document entitled "ANNUAL ACCOUNT STATED AMOUNTS OWED BY TOIL TO FRANK WINSTON FOR CALENDAR YEAR ENDING DECEMBER 31, 1977," reflects that T.O.I.L. owed petitioner the following amounts: Authorized But Uncollected
Salaries From prior Years
$ 62,400
Salary For Current Year
54,000
Authorized But Uncollected
Clergyman House Allowance
For Prior Years
52,341
Interest At 6% For Prior
Year Uncollected House
Allowances
3,140
House Allowance for Current
Year
13,257
TOTAL:
$185,138
*427 This document also contained the following note: DEDUCT DONATIONS TO TOIL DURING CURRENT YEAR, IF ANY. DESCRIBE DONATION AND DATE OF ACCEPTANCE BY TOIL HERE: Accepted by TOIL 12/31/77 F.W. $5,764.00 Deducted from Clergyman House Allowance and TOIL Debt to F.W. in the amount of $5,764.00 is forgiven as a charitable contribution. As of the date of trial, T.O.I.L. had not paid petitioner any portion of the accumulated amounts for his salary or clergyman's house allowance. On his 1977 Federal income tax return, petitioner claimed a charitable contribution deduction in the amount of $5,764 which is based on the amount of T.O.I.L.'s purported indebtedness forgiven by petitioner as indicated in the document referred to above. In arriving at the precise amount of the charitable contribution, petitioner, after consulting his accountant, took into consideration the amount he would need as a deduction to offset his 1977 taxable income, thereby reducing his 1977 tax liability to zero and allowing him to receive a full refund of taxes withheld during the course of the year. OPINION 1. The Charitable Contribution Deduction
*428 Section 170(a)(1) provides, as a general rule, that there shall be allowed as a deduction "any charitasble contribution * * * payment of which is made within the taxable year." A charitable contribution is defined in section 170(c) as "a contribution or gift to or for the use of" the organizations described therein. Petitioner contends that when he forgave a portion of a purported debt owed to him by T.O.I.L., his church, for an authorized but unpaid clergyman's house allowance, he made a deductible charitable contribution to T.O.I.L. in the amount forgiven. We do not agree. We sustain respondent's disallowance of the deduction. Section 1.170A-1(a)(1), Income Tax Regs., requires that the contribution must be "actually paid during the taxable year." To show that "payment" of the claimed contribution was made during the taxable year, the taxpayer must establish that he parted with dominion and control over the alleged gift. Glynn v. Commissioner,76 T.C. 116, 121-122 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982). *429 In Guren v. Commissioner,66 T.C. 118, 121 (1976), the Court stated that "the term 'payment' * * * must be taken to mean what it says," i.e., an outlay of cash or property. None of the evidence establishes that petitioner, in making his claimed contribution, parted with dominion and control of a gift in the form of cash or property. Petitioner merely forgave T.O.I.L. a portion of its obligation to pay petitioner an authorized but unpaid clergyman's house allowance for the year at issue. As indicated above, it was stipulated that this housing allowance was authorized as a means of compensating petitioner for services rendered by him to T.O.I.L. as its Prime Minister and, as stated by petitioner, was "in addition to" and "a part" of petitioner's T.O.I.L. salary. By forgiving a portion of T.O.I.L.'s obligation to pay petitioner his housing allowance, petitioner was actually contributing to T.O.I.L. nothing more than the value of his services, certainly not cash or property. Such a contribution, therefore, cannot constitute a "payment" which was "made within the taxable year." *430 Sec. 1.170A-1(g), Income Tax Regs., expressly disallows a charitable contribution deduction for services. See Tate v. Commissioner,59 T.C. 543, 549 (1973). The regulation is designed to deny deductions for the value of services where such value has not been included in taxable income. [3]
*431 Petitioner argues that (1) had he contributed cash to T.O.I.L. and then received back the same amount as a cash housing allowance, or (2) had he been paid the housing allowance by T.O.I.L. and then contributed the cash to T.O.I.L., his contribution to T.O.I.L. in either situation would qualify as a deduction. In substance, he argues, his forgiveness of part of the housing allowance allegedly due him was similar. We do not agree. The short answer is that petitioner's claim to a deduction must be tested by what he actually did, not what might have been done. For the reasons stated, the forgiveness of a purported debt generated by services, certainly an uncollectable one, does not constitute "payment" of a charitable contribution within the meaning of section 170. More fundamentally, the charades that petitioner has posited must be examined in the light of the practical facts of this case. T.O.I.L. had no money or other assets whatever with which to pay a housing allowance, and any transfer of funds by him to T.O.I.L. to enable T.O.I.L. to pay him a housing allowance would not be a *432 deductible charitable contribution because the transfer would be made "with the expectation of receiving a commensurate benefit [i.e., the housing allowance] in return * * *." Sedam v. United States,518 F.2d 242, 245 (7th Cir. 1975); cf Singer Co. v. United States,196 Ct. Cl. 90, 103, 449 F.2d 413, 422-423 (1971); Seed v. Commissioner,57 T.C. 265, 276 (1971). Likewise, a housing allowance paid to him by T.O.I.L., which by prearrangement was to be returned to T.O.I.L., would not be excludable from his gross income under section 107 because it would not, in the language of the section, be "used by them to rent or provide a home." H. Rept. No. 1337, 83d Cong., 2d. Sess., to accompany H.R. 8300, p. 15 (1954); S. Rept. No. 1622, 83d Cong., 2d. Sess., to accompany H.R. 8300, p. 16 (1954). Sec. 1.107-1(c), Income Tax Regs. As a result, any deduction to which petitioner might be entitled, would be offset by an equal amount of taxable income.[4]
*433 Petitioner's reliance on Story v. Commissioner,38 T.C. 936 (1962), is misplaced. There, the taxpayers advanced a sum of money to a charitable organization to build a chapel and received a promissory note from the organization in the amount of the funds advanced.The note was secured by a mortgage on the tract of land on which the chapel was to be built. At the end of each of the 5 succeeding years, the taxpayers forgave a specific portion of the principal amount of the note and deducted such amounts each year as charitable contributions. The Court held that when the taxpayers advanced the money to the organization in return for the secured note, the parties intended to create a true debt and, thus, the taxpayers were allowed to deduct, as charitable contributions, the specific amounts of indebtedness cancelled in each year. The facts in the instant matter are distinguishable from those in Story. Here, rather than advancing cash in return for a secured note, as did the taxpayer in Story, petitioner advanced neither cash nor property. As we have discussed above, petitioner donated only his services which do not constitute a "payment" for purposes of *434 section 170(a)(1). Cancellation of a debt created by the performance of services likewise does not constitute "payment" of a contribution. Further, we do not think, in these circumstances, that a true debt ever existed between T.O.I.L. and petitioner. As noted in our Findings of Fact, T.O.I.L. was controlled solely by petitioner; T.O.I.L. had authorized substantial amounts for salary and housing allowance for petitioner not only for 1977, but for prior years as well, none of which had ever been paid. T.O.I.L. at no time had the ability to pay the sums it had purportedly obligated itself to pay. Petitioner, therefore, when he rendered his services on T.O.I.L.'s behalf, could not reasonably have expected that any of the amounts authorized for 1977 would ever be paid. The absence of a reasonable expectation of repayment belies the existence of a true debt. Scovill v. Commissioner,36 B.T.A. 1214 (1937), revd. on other grounds sub nom., Moore v. Commissioner,101 F.2d 704 (2d Cir. 1939). Thus Story is inapposite to the instant matter. Petitioner finally argues that to deny him a charitable contribution deduction in these circumstances *435 violates his First Amendment right to the free exercise of his religion. This argument too is without merit. Deductions are clearly matters of legislative grace. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934). Had petitioner performed services for the most traditional of religious organizations and attempted to deduct the value of those services as a charitable contribution, no deduction would be allowable to him under section 170(a)(1). Because petitioner is not entitled to a charitable contribution deduction under these circumstances, respondent's deficiency determination is sustained.
2. The Addition to Tax
There remains the addition to tax under section 6653(a). Under that section, a 5-percent addition to tax shall be imposed if any part of the underpayment of tax is due to negligence or intentional disregard of the revenue laws. [5] With respect to this issue, petitioner bears the burden of proving that respondent's imposition of the addition is erroneous. Enoch v. Commissioner,57 T.C. 781, 802 (1972). *436 Petitioner testified at trial that before he claimed the charitable contribution deduction, he "discussed it with other people and tax practitioners" and he himself "read the law * * * in the Code Books." On this basis, petitioner concluded that the deduction was proper. Petitioner, however, has not identified the "other people" or "tax practitioners" with whom he consulted and we find it hard to believe that any competent tax practitioner would have advised petitioner that his charitable deduction had any basis in fact or law. Taking the deduction so obviously lacking in merit as this one without competent legal or accounting advice was negligence. As we interpret the facts of this case, we think that petitioner, who was solely in control of T.O.I.L, arranged T.O.I.L.'s purported debt knowing that it never could or would be paid, and claimed the charitable contribution deduction only in order to completely offset his tax liability. In doing so, we find that his intention was to disregard the tax laws. Thus, we sustain the addition to tax. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. The stipulation of facts filed by the parties contains the following: For purposes of this case, respondent concedes that the T.O.I.L. is a church, exempt from taxation under I.R.C. Section 501 and a qualifying donee for charitable contribution purposes, under I.R.C. Section 170↩.
3. See Etheridge v. Commissioner,T.C. Memo. 1977-175. This rationale is consistent with the regulations under sec. 166, which disallow bad debt deductions for debts arising from unpaid wages, salaries, rents, interest, and similar items constituting taxable income unless the income such items represent has been included in the return of income for the year for which the reduction as a bad debt is sought to be made, or for a previous year. Sec. 1.166-1(e), Income Tax Regs. See Collin v. Commissioner,1 B.T.A. 305, 309 (1925), in which it was stated: [I]n providing that debts ascertained to be worthless and charged off within the taxable year, Congress clearly expressed the intent that items so charged off should have had a prior standing on the taxpayer's accounts, as income, or as capital.↩
4. The artificiality of this whole arrangement between petitioner and his personally controlled T.O.I.L., which had no assets and ostensibly owed petitioner alone $185,138 for his unpaid services and allowances, is shown by the following testimony on cross-examination: Q: To date--this is 1983--has the church ever paid you any amounts for salary or parsonage allowance? A: They have not. Q: How did you decide at year-end 1977 on the amount of $5,764 to donate to the church? A: Well, I felt that this was the amount that I could donate and have the tax benefit out of it. * * * Q: Is it your testimony that his amount of $5,764 is just that amount that you would need to offset your tax liability for 1977? A: Well, that is what my accountant told me and that is the amount--I told him to let me know how much I could utilize from--benefit with a donation.And he told me that that was the amount, and that is the amount I forgave the church.↩
5. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes), is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩