Austin Lowrey and Esther B. Lowrey v. Commissioner.
Lowrey v. Commissioner
Docket No. 5403-63.
United States Tax Court
T.C. Memo 1965-206; 1965 Tax Ct. Memo LEXIS 123; 24 T.C.M. (CCH) 1078; T.C.M. (RIA) 65206; July 27, 1965
Scott P. Crampton, for the petitioners. Donald W. Howser, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined a deficiency in petitioners' income tax for 1961 in the amount of $3,057.71. Petitioners claim an overpayment of their income tax for 1961. The issues are (1) whether petitioners are entitled to depreciation deductions on certain properties owned by them and whether they are entitled to deductions for fire insurance and for travel expenses incurred in connection with such properties; (2) whether petitioners are entitled to a deduction for a finder's fee paid by them in obtaining a loan; (3) whether petitioners are entitled to a deduction for a theft loss; and (4) the amount of depreciation deduction to which petitioners are entitled in connection with certain other property owned by them. Findings of Fact Some of the facts were stipulated and they are so found. Austin Lowrey and Esther B. Lowrey, husband and wife, are residents of Washington, D.C. They filed a joint Federal income tax return for 1961 with the district director of internal *125 revenue for the district of Maryland. In 1961 Austin Lowrey, hereinafter called the petitioner, was a physician in the Medical Corps, United States Army, and was stationed during that year at Walter Reed Hospital and in the Surgeon General's office. In 1948 petitioner purchased 345 acres of timberland in Jefferson County, West Virginia, for the amount of $6,750. In 1950 petitioner purchased for $12,500 about 1,700 acres of improved real property (known as the Valley Farm) located in Hampshire County, West Virginia. The improvements on the Valley Farm consisted of a log house, a small house, a large barn, corn crib, hog house and chicken house. About 1950 petitioner purchased the Wilson Farm (consisting of about 315 acres) in Hampshire County, West Virginia, for $8,000. The improvements on the Wilson Farm consisted of a large frame house, a large barn, corn crib, chicken house, and several smaller buildings. In 1957 petitioner purchased for about $105,000 an improved parcel of real estate located at Capon Bridge, Hampshire County, West Virginia. The property, known as Sporting Field Farm, consisted of approximately 589 acres. The improvements on the property consisted of a large *126 two-story brick colonial house, a garage, three barns and three silos, and other buildings. In December 1958 petitioner purchased for $25,000 an improved parcel of real property of about five acres (known as High Banks) located in Fairfax County, Virginia. A three-bedroom frame house was situated on this property. The property was rented by petitioner throughout 1961. On February 13, 1959 petitioner purchased for $15,000 an improved parcel of real property containing about 97 acres (known as the Sine Farm) in Hampshire County, West Virginia. The improvements on the Sine Farm, consisting of a house, garage, barn and chicken house, were in an old condition when petitioner acquired the property. On August 10, 1961, petitioner purchased for $5,500 an improved parcel of real estate containing about 65 acres (known as the Strong Farm) located in Hampshire County, West Virginia. The improvements on the Strong Farm consisted of a house, a barn and a windmill. The Sporting Field Farm and the Sine Farm were adjoining tracts of property. The Strong Farm, the Wilson Farm and the Valley Farm were adjoining tracts of property. In October or November 1960 petitioner met George E. Stover and, *127 after a visit to petitioner's properties in West Virginia, petitioner discussed his plans for a real estate development, including recreational facilities and boys' camp. To carry out some of these plans petitioner and Stover formed the Maxwellton Highlands Livestock Corporation early in 1961 and shortly thereafter organized a corporation called the Maxwellton Highlands Lodge. Early in 1961 petitioner and Stover purchased a herd of registered Black Angus cattle in the name of the Maxwellton Highlands Livestock Corporation. Stover signed notes for a bank loan which was used to finance the cattle purchase. In June 1961 Stover and his family moved to the Sporting Field Farm. In November 1961, Maxwellton Highlands Livestock Corporation filed an application with a bank for a Small Business Administration loan of about $33,000. The application was signed by petitioner as vice president and treasurer and by Stover as president and general manager. It stated that the loan would be used to develop a youth ranch, a dude ranch, a hunting and fishing preserve, and a lake. The loan application listed current assets of $50,945 and net fixed assets of $269,400, including land shown in the amount *128 of $89,900 and buildings in the amount of $160,000. Mortgages payable in the amount of $89,800 were also listed in the application, with the Sporting Field Farm, the Strong Farm, the Sine Farm, and 57 head of cattle as security for such mortgages. The application indicated that Maxwellton Highlands Livestock Corporation was owned 80 percent by petitioner and 20 percent by Stover. The loan application was still pending at the end of 1961. During 1961 some roads were built, building sites were cleared, and surveying work was done on some of the properties located in Hampshire County, West Virginia. Petitioner made frequent trips in 1961 to West Virginia for the purpose of inspecting his properties, to paint and repair buildings, and to discuss business matters with Stover. Petitioner obtained a loan of $20,000 from A. Carter Whitehead, Trustee, and the loan statement (dated December 30, 1959) indicates that petitioner paid a finder's fee of $2,000 to James M. Thompson and A. Carter Whitehead in connection with such loan. The loan statement also indicates that several items totaling $4,288.26 (including $2,000 finder's fee) were deducted from the face amount of the loan so that petitioner *129 received cash proceeds of $15,711.74. The loan was secured by petitioner's properties in Hampshire County, West Virginia. This loan was repaid by petitioner in January 1963. In 1961 petitioner paid a premium of $634.40 for fire insurance on the Sporting Field Farm property and also paid a premium of $64.90 for fire insurance on the dwelling at High Banks. In his notice of deficiency the respondent disallowed rental expenses of $2,670 and certain itemized deductions claimed by petitioners, including an interest deduction of $9,229.23 and a real estate tax deduction of $652.20. It has now been stipulated that petitioners are entitled to a deduction of $8,707.68 for interest paid in 1961 and to a deduction of $652.19 for taxes paid in 1961. Petitioners' return for 1961 shows rental income of $1,470 and $1,200, for a total of $2,670, and the deductions claimed by petitioners against such rental income include depreciation deductions of $650 and $600, for a total of $1,250. In an amended petition filed in January 1965 the petitioners claimed depreciation deductions as follows: Sporting Field Farm
$2,638.62
Sine Farm
349.95
High Bank
844.40
Strong Farm
125.00
Valley Farm
277.78
Wilson Farm
266.67
Total
$4,502.42
*130 Petitioners, in their amended petition, also claimed a theft loss deduction of $3,000 in connection with the purported theft of timber from one of their properties in West Virginia. Opinion Respondent argues that petitioner is not entitled to depreciation deductions on his various West Virginia properties because such properties were not used in petitioner's own trade or business or held for the production of his own income. It is respondent's position that such properties were used in business ventures conducted by Maxwellton Highlands Livestock Corporation and Maxwellton Highlands Lodge, two corporations organized by petitioner and Stover, and that any deductions in connection with such properties would inure to the corporations, not to the petitioner. The record before us is hardly a model of clarity. Much of the evidence is vague and it is difficult to ascertain the exact nature of the business relationship of the parties or the form in which the business ventures was [were] to be conducted. However, we believe the existence of the two corporations in 1961 is established by the record, and it also appears from the record that Stover was active in 1961 in preparing the West *131 Virginia properties owned by petitioner for use as a children's camp. But these facts do not help respondent. The documentary evidence and petitioner's testimony are all to the effect he owned all of the West Virginia property in 1961. Stover, who was called as a witness for respondent, testified that none of the West Virginia properties was ever transferred by petitioner to a corporation. Nor is there any evidence to the contrary in the record. Petitioner paid interest and taxes in connection with these properties in 1961 and these payments have been stipulated. If the corporations owned any property (as indicated in their small business loan application), the record clearly shows they did not own any of the realty here involved in 1961. This did not deter respondent from arguing on brief: "The evidence shows that the property was used in the business of two corporations, Maxwellton Highlands Livestock Corporation and Maxwellton Highlands Lodge." As stated, there is just no evidence in the record on which to base such a conclusion. It will serve no useful purpose to outline at any length the testimony of Stover and to attempt to reconcile it with petitioner's testimony. We are *132 satisfied, upon review of all the evidence, that petitioner in 1961 was the owner of the West Virginia properties and was holding them for the production of income for use as a children's camp or for various recreational activities. Section 212(2) of the Internal Revenue Code of 1954 allows an individual to deduct all ordinary and necessary expenses incurred "for the management, conservation, or maintenance of property held for the production of income." Under the regulations, it is immaterial for purposes of the statute that the property is not currently productive. Section 1.212-1(b), Income Tax Regs.Section 167(a) of the Internal Revenue Code of 1954 allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear * * * of property held for the production of income." We hold that, under these sections, petitioner is entitled to a depreciation deduction on the improvements on the various West Virginia properties owned by him in 1961. It remains to make some allocation of the purchase *133 price of these various properties between the land and the improvements, and to determine the useful lives of such improvements. Petitioner's contentions may be summarized as follows: Amount of
Property and
Purchase price allocation
Estimated
dep.
approx. acreage
Land
Improvements
Life
deduction
Sporting Field Farm
$39,091.78
$65,965.42
25 yrs.
$2,638.62
589 acres
Sine Farm
8,000.00
7,000.00
15 yrs.
466.67
97 acres
Strong Farm
4,500.00
1,000.00
10 yrs.
100.00
65 acres
Wilson Farm
4,000.00
4,000.00
15 yrs.
266.67
315 acres
Valley Farm
8,333.33
4,166.67
15 yrs.
277.78
1,700 acres
We have considered the appraisals given by petitioner's witness as well as the other evidence in the record bearing upon the values of these properties. On the whole, the evidence as to values is far from satisfactory. Much of it amounts to little more than recitals of figures by the petitioner. Using our best judgment we find, on the basis of the whole record, that the following portions of the purchase price of the various properties is allocable to the improvements on such properties: Sporting Field Farm, $50,000; Sine Farm, *134 $4,000; Strong Farm, $1,000; Wilson Farm, $2,000; and the Valley Farm, $1,500. We see no reason to disturb the useful lives attributed by petitioner to the improvements on the various properties. Petitioner's High Banks property located in Fairfax County, Virginia, was rented throughout 1961. It consisted of a 3-bedroom house on about five acres of land and it was purchased by petitioner for $25,000 in 1958. In his 1960 income tax return petitioner claimed a depreciation deduction computed by allocating $15,000 (which he calls "a guess") of the purchase price to the improvements. Petitioner now argues that $21,110 is allocable to the improvements and he uses the county tax assessor's valuations (land, $770, and buildings, $4,180) as support for this higher allocation. We think this evidence provides some support for the higher figure and, on this record, we find for the petitioner. We also accept petitioner's contention that the improvements on the High Banks property had a useful life of 20 years when purchased by petitioner. Our finding that the petitioner in 1961 held the various properties acquired by him for the production of income within the meaning of section 212(2) of the Internal Revenue Code *135 of 1954 also disposes of the issues involving the deductibility of the fire insurance premiums of $634.40 on the Sporting Field Farm, the finder's fee of $2,000 paid to obtain a loan of $20,000 in 1961 secured by some petitioner's West Virginia properties, and the travel expenses incurred by petitioner in traveling from his home in Washington, D.C. to West Virginia in order to look after his properties there. We are satisfied, on the basis of the entire record, that these costs were incurred to maintain the various properties and are properly deductible as ordinary and necessary expenses under section 212 of the Internal Revenue Code of 1954. As to the amount of the travel expenses incurred by petitioner in 1961, he does not present us with any records of expenditures incurred but claims he made approximately seventy-seven [1] 180-mile round trips from his home to West Virginia. He testified that, as a general rule, he did not stay overnight in West Virginia and that when he did, he would stay in a converted garage on the Sporting Field Farm. To obtain the amount of the deduction, petitioner uses a cost figure of $.10 per mile, citing Revenue Ruling 64-10, 1964-1 *136 (Part 1) C.B. 667, 668, and claims he is entitled to a deduction of $1,386. Petitioner cannot rely upon this revenue ruling to establish the amount of his travel expense because such ruling explicitly states that it is applicable only for taxable periods after December 31, 1962. About all the record establishes with any certainty is that petitioner did make some trips to West Virginia in 1961 and that such trips were made in connection with his West Virginia properties. [2] On this record we find that petitioner is entitled to a deduction in 1961 for travel expenses in the amount of $500. Cohan v. Commissioner, 39 F. 2d 540. *137 Petitioner also claimed for the first time in an amended petition that he was entitled to a theft loss deduction of $3,000 under section 165(c)(3) of the Internal Revenue Code of 1954 for the theft of timber from one of his properties. Section 165(e) of the Internal Revenue Code of 1954 provides that "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." Petitioner testified that "I didn't know about this big loss until late in '62." It is obvious that petitioner is not entitled to a theft loss in 1961 under the statutes cited above. There is no merit in petitioner's argument in his reply brief that, under some rule of agency, he received constructive notice of the theft loss in 1961. Decision will be entered under Rule 50. Footnotes
1. Petitioner explained that he kept track of his trips by circling calendar dates. He also testified as follows: * * * I couldn't find the calendar when I made out my returns, and, therefore, I didn't know how many I had put in. I put in twenty, I think, on my returns, and then, later on, I found the calendar and I found that there were seventy-some circles.↩
2. Respondent on brief admits petitioner made trips to his West Virginia farms in 1961 but he is unwilling to admit he drove his own car. On brief he offers the interesting speculation that "petitioner may have had an accommodation pass on a commercial carrier or he may have ridden with an acquaintance at no charge."↩