T.C. Memo. 2010-96

UNITED STATES TAX COURT

JERRY A. AND MARJO E. NELSON, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12119-08.                    Filed May 4, 2010.

Daniel J. Frisk, for petitioners.

Blaine Holiday, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, Judge:  The Internal Revenue Service (IRS) issued
to petitioners Jerry A. and Marjo E. Nelson a statutory notice of
deficiency on February 13, 2008, pursuant to section 6212,[1]

_____

[1]Unless otherwise indicated, all citations of sections refer
to the Internal Revenue Code of 1986 (26 U.S.C.), as amended, and
all citations of Rules refer to the Tax Court Rules of Practice
and Procedure.

showing the IRS's determination of a deficiency of $2,910,322 in their joint income tax for 2003 and an accuracy-related penalty of $582,064.40 under section 6662(a). After concessions, the issues for decision are: (i) whether amounts paid by the Nelsons' limited liability companies are deductible, either as fees pursuant to section 162 or as interest expenses pursuant to section 163; and (ii) whether the Nelsons are liable for the accuracy-related penalty pursuant to section 6662(a). On the basis of the facts proved at trial, the Nelsons are not entitled to deduct most of the disputed amounts, and they are liable for the penalty.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts filed September 15, 2009, and the attached exhibits are incorporated herein by this reference. The Nelsons resided in North Dakota at the time they filed their petition. Trial of this case was held in St. Paul, Minnesota, on September 15 and 16, 2009.

Bank conversions

In 2003 numerous mutual savings and loan associations proposed to go public as corporate banks, and they offered their account holders options to purchase the new stock at advantageous prices. Petitioner Jerry Nelson arranged for loans to be made to these account holders in return for a share of the profit they

could realize upon a prompt sale of the newly acquired stock, which share Mr. Nelson refers to as "interest".[2]  To obtain funds to lend to these account holders, Mr. Nelson arranged for limited liability companies (L.L.C.s) that he and his wife co-owned (as described below) to borrow money from lenders who wanted to invest in the venture.  These lenders were usually friends, acquaintances, or relatives of Gus Boosalis, Mr. Nelson's son-in-law; and the loans, though very substantial, were made under oral agreements communicated over the telephone.  When an L.L.C. was to pay off a loan, Mr. Nelson's routine was to write two checks-- one check to repay the principal of the loan and a second check to pay the interest due on the loan.

These loans were made to three L.L.C.s of which he and Mrs. Nelson owned 100 percent:  Long Financial L.L.C. (LF), Trust Financial L.L.C. (TF), and Old Financial L.L.C. (OF).  The L.L.C.s in turn lent money to the account holders.  The loans to the account holders were documented by conventional written loan agreements.

[2]The amount paid by the account holder/borrower is not conventional interest measured by a percentage rate times the length of time the loan is outstanding.  For purposes of this case we need not and do not decide the character of these "interest" payments, which is not in dispute.

Capital Resources Management

When Mr. Nelson became aware of a savings and loan association that had announced it would convert to a corporate bank, he hired a third party (to which Mr. Nelson refers as a "finder") to arrange for depositors to borrow from one of Mr. Nelson's L.L.C.s. One such finder (the one directly relevant to this suit) was Capital Resources Management, Inc. (CRM). For a fee CRM found a local attorney to act as escrow agent, found account holders, confirmed their suitability as borrowers, negotiated the loan agreement with the account holder, prepared the necessary documentation, monitored the account holder's purchase of stock, calculated the amount owed to the lending L.L.C. by the borrowing account holder, made a demand of the borrower, received the borrower's payment, and transmitted the payment to the L.L.C. Mr. Nelson's agreement with CRM, pursuant to which CRM agreed to provide these services and Mr. Nelson agreed to pay for them, was an oral agreement. When a transaction was completed, Mr. Nelson paid to CRM the fees it had earned under their agreement.

However, sometimes CRM also participated in the transactions as a lender. That is, when Mr. Nelson was obtaining and pooling funds from his lenders in one of the L.L.C.s, CRM would sometimes lend as one of the investors, and its lent funds were then part of the lending pool. Thus, for this purpose CRM transferred to

TF $450,000 on September 4, 2003, and transferred to LF $100,000 on September 4, 2003, and $300,000 on December 1, 2003. (The principal amounts of these loans were all returned in 2003. See infra notes 3 and 4 and accompanying text.)

If a given pool of loans was for a bank conversion for which CRM served as the finder and was also a lender, then on that conversion CRM would make money both from its finder's fees and from its lending. As a result of Mr. Nelson's dealings with CRM as both finder and lender, the L.L.C.s from time to time owed CRM three types of amounts--(1) finder's fees, (2) interest on loans CRM had made, and (3) the principal amounts of those loans.

Mr. Nelson's bookkeeping

As we have noted, the Nelsons' L.L.C.s had written agreements with their borrowers (i.e., the account holders) but only oral agreements with the L.L.C.s' lenders and finders. For that reason, one cannot consult any written agreement to calculate or justify the amounts paid as interest (to CRM or others) or as finder's fees (to CRM or others). Mr. Nelson did not retain whatever notes he made in 2003 to keep track of his agreements with the various lenders and finders. The record includes no minutes, memoranda, phone logs, or other records that show the identities of the lenders, the dates or amounts of their loans, or the interest terms. Apart from the L.L.C.s' bank statements, Mr. Nelson maintained no books and records for the

L.L.C.s.  Rather, for each of the three L.L.C.s, Mr. Nelson simply composed at year's end one handwritten page consisting of an entry of a total amount of gross income and a list of expenses.  He gave these three sheets to his accountant to prepare the L.L.C.s' Forms 1099-INT, Interest Income; Forms 1099-MISC, Miscellaneous Income; and tax returns.

2003 payments to CRM

In 2003 LF made one direct transfer to CRM's account (a supplemental payment of CRM's fees and expenses for a transaction) and issued nine checks to CRM.  The checks were in the amounts listed below; and on the "Memo" lines on the checks, the notations given below were written:

| Check No. | Date | Amount | "Memo" Line |
|-----------|------|--------|-------------|
| 1181 | 1/31/03 | $350,000.00 | "Principal" |
| 1182 | 1/31/03 | 105,265.84 | "Interest" |
| 1189 | 2/01/03 | 527,772.03 | "Expense" |
| --- | 4/23/03 | 34,050.83 | [Direct transfer] |
| 1129 | 10/20/03 | 100,000.00 | "Principal Return" |
| 1131 | 10/20/03 | 110,693.40 | "Int & Fees" |
| 1143 | 11/20/03 | 494,271.60 | "Fees & Expenses Paid" |
| 1201 | 12/31/03 | 73,886.73 | "Fees" |
| 1202 | 12/31/03 | 300,000.00 | "Principal Return" |
| 1203 | 12/31/03 | 23,786.19 | "Interest" |
| Total | | 2,119,726.62 | |

Thus, of the total of $2,119,726.62 that LF paid to CRM in 2003, the checks marked "Principal" and "Principal Return" totaled

$750,000.[3]  The checks marked as interest, fees, and expenses, along with the direct transfer, totaled $1,369,726.62.

In 2003 TF made one direct transfer to CRM's account (a $50,000 repayment of principal) and issued three checks to CRM. The checks were in the amounts listed below; and on the "Memo" lines of the checks, the notations given below were written:

| Check No. | Date | Amount | "Memo" Line |
|---|---|---|---|
| --- | 9/15/03 | $50,000.00 | [Direct transfer] |
| 1095 | 11/20/03 | 144,696.90 | "Interest" |
| 1096 | 11/20/03 | 279,972.10 | "Fees & Expenses" |
| 1097 | 11/20/03 | 400,000.00 | "Principal Return" |
| Total | | 874,669.00 | |

Of that total of $874,669 that TF paid to CRM in 2003, the checks marked "Principal Return" and the direct transfer totaled $450,000.[4]  The checks marked as interest, fees, and expenses totaled $424,669.

---

[3]LF's "Principal Return" of $100,000 on October 20, 2003 (check No. 1129), was evidently in repayment of CRM's transfer to LF of $100,000 on September 4, 2003; and LF's "Principal return" on December 31, 2004 (check No. 1202), was evidently in repayment of CRM's direct transfer to LF of $300,000 on December 1, 2003. The record does not show the CRM-to-LF loan that was repaid by LF's "Principal" payment of $350,000 on January 31, 2003, and we assume that loan was made before 2003.

[4]The $50,000 direct transfer on September 15, 2003, and the "Principal Return" of $400,000 on November 20, 2003 (check No. 1097), were evidently in repayment of CRM's direct transfer to TF of $450,000 on September 4, 2003.

We find that $750,000 of the LF payments and $450,000 of the TF payments to CRM were repayments of principal that CRM had previously lent to the L.L.C.s, and we find that $1,369,726.62 of the LF payments and $424,669 of the TF payments to CRM were for interest, fees, and expenses.

The L.L.C.s' Forms 1099 for CRM

Sometime after the end of 2003 Mr. Nelson directed his accountant to issue Forms 1099 for the payments that the L.L.C.s had made to CRM in 2003. The amounts of the L.L.C.s' Forms 1099 were taken from the handwritten lists of income and expenses that Mr. Nelson had prepared. Mr. Nelson's list for LF included two entries for CRM, i.e.--

| Fees | Capital Resource CRM | $1,450,000.80 |
| Interest | Capital Resource | 155,447.78 |

--and LF issued to CRM a Form 1099-MISC for the first of these amounts and a Form 1099-INT for the second. Those amounts total $1,605,448.58, rather than the total amount of the LF checks to CRM marked as interest, fees, and expenses (i.e., $1,369,726.40). The difference is $235,722.18.

Similarly, Mr. Nelson's list for TF included two entries for CRM, i.e.--

| Fees | Capital Resource CRM | $448,579.99 |
| Interest | Capital Resource CRM | 144,696.90 |

--and TF issued to CRM a Form 1099-MISC for the first of these amounts and a Form 1099-INT for the second.[5] Those amounts total $593,276.89, rather than the total amount of the TF checks to CRM marked as interest, fees, and expenses (i.e., $424,669). The difference is $168,607.89.

Income tax reporting

The Nelsons and the three L.L.C.s filed their 2003 income tax returns on the cash-basis method of accounting. The L.L.C.s filed partnership tax returns[6] that the Nelsons admit claimed deductions for interest and fees that included the amounts that were reported on the Forms 1099 issued to CRM--that is, amounts that were greater than the total amount of the checks that were marked as interest, fees, and expenses. Items from the partnership return were carried over to the Nelsons' Form 1040, U.S. Individual Income Tax Return. Thus, the Nelsons reported interest income from the L.L.C.s, and the amounts so reported had

---

[5]In fact, TF's Form 1099-INT appears to state $144,606.90, rather than $144,696.90, but we assume that the discrepancy is attributable to a typographical error.

[6]The Nelsons treated their three L.L.C.s as partnerships and filed partnership tax returns, and respondent has not contended that this was incorrect. An L.L.C. with at least two members may be classified for Federal income tax purposes as a partnership or as a corporation. See 26 C.F.R. sec. 301.7701-3, Proced. & Admin. Regs. The default classification for an L.L.C. with at least two members is a partnership. Id. We therefore assume that the Nelsons' L.L.C.s are classified as partnerships for purposes of deciding this case.

been reduced by the deductions that LF and TF had taken for amounts allegedly paid to CRM.

Notice of deficiency

On February 13, 2008, the IRS issued to the Nelsons a notice of deficiency that, among other things, increased their net income from the L.L.C.s. That increase included certain amounts that the parties resolved by agreement after trial, but it also reflected the disallowance of amounts that the L.L.C.s paid to CRM (and that the Nelsons had used to reduce their income), which are still in dispute. The Nelsons timely filed a petition in this Court seeking redetermination of the deficiency.

OPINION

I.  Burden of proof

At issue is the Nelsons' entitlement to deductions for a portion of the amounts the L.L.C.s paid to CRM as interest or fees. Deductions and credits are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any deduction or credit claimed. Rule 142(a); see also Deputy v. du Pont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Generally, the Commissioner's determination in the notice of deficiency is presumed to be correct, and the taxpayer bears the burden of proving that the Commissioner's determination is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The

Nelsons do not argue that the burden of proof shifts to respondent under section 7491(a)(1).

The particular matter that the Nelsons have the burden to prove is the character of payments made, a subject for which the books and records of the payor would naturally be consulted. Section 6001 requires that--

> Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. * * *

The regulations implementing that statute include 26 C.F.R. section 1.6001-1(a), Income Tax Regs.,[7] which provides that "any person subject to tax" (such as the Nelsons) "or any person required to file a return of information with respect to income" (such as the L.L.C.s)[8] is required to

---

[7]See also 26 C.F.R. sec. 1.446-1(a)(4), Income Tax Regs. ("Each taxpayer is required to make a return of his taxable income for each taxable year and must maintain such accounting records as will enable him to file a correct return. See section 6001 and the regulations thereunder. Accounting records include the taxpayer's regular books of account and such other records and data as may be necessary to support the entries on his books of account and on his return, as for example, a reconciliation of any differences between such books and his return").

[8]An L.L.C. that is classified as a partnership is required to file a Form 1065, U.S. Return of Partnership Income. See sec. 6031(a); sec. 1.6031(a)-1, Income Tax Regs.; see also Atl. Veneer Corp. v. Commissioner, 85 T.C. 1075, 1079 (1985) (the requirement for a partnership to make a return under sec. 6031(a) is satisfied by filing a Form 1065), affd. 812 F.2d 158 (4th Cir. 1987).

> keep such permanent books of account or records * * *
> as are sufficient to establish the amount of gross
> income, deductions, credits, or other matters required
> to be shown by such person in any return of such tax or
> information.

Mr. Nelson, however, kept no "permanent books of account" for the L.L.C.s; indeed, he kept virtually no records at all. As we will show, this effectively disables the Nelsons from proving their contentions in this suit.

## II. Deductible vs. non-deductible payments

The parties do not disagree about the general legal principles that govern the outcome of this case. First, compensation for services rendered, such as a bona fide finder's fee or commission, is generally deductible as an ordinary and necessary business expense under section 162. See Lowery v. Commissioner, T.C. Memo. 1965-206, 24 T.C.M. (CCH) 1078, 1081 (1965) ("finder's fee"); 26 C.F.R. sec. 1.162-1(a), Income Tax Regs. ("commissions"); 26 C.F.R. sec. 1.162-7, Income Tax Regs. ("compensation for personal services"). Second, interest paid on "indebtedness" is generally deductible under section 163. However, it is axiomatic that repayment of the principal of such an indebtedness is not deductible. See Crawford v. Commissioner, 11 B.T.A. 1299, 1302 (1928) ("Deductions are not permitted on account of the repayment of loans"). Again, the parties agree on these principles, but they disagree about their application in this case because they disagree about the character of the

payments that the L.L.C.s made to CRM, to which issue we now turn.

III. <u>The character of the amounts paid to CRM</u>

    A.    <u>The Nelsons' attempted recharacterization of the principal repayments</u>

For 2003 LF deducted a total of $1,605,448.50 and TF deducted a total of $593,276.89 for payments to CRM, and they reported those amounts on Forms 1099. LF and TF had each made payments to CRM in 2003 in gross amounts greater than those amounts (i.e., $2,119,726.40 from LF and $874,669 from TF), but the question to be decided is whether the L.L.C.s made payments that constituted interest, fees, and expenses--and <u>not</u> repayments of principal--in amounts equal to the deductions claimed. We hold that, in large part, the Nelsons have not proved that they did.

Respondent does not dispute the deductibility of the payments for which there are checks explicitly identifying the payments to CRM as interest, fees, or expenses--i.e., a total of $424,669 paid by TF and $1,335,675.57 by LF. However, respondent does dispute any greater deduction.

We agree with respondent, to the extent that the Nelsons attempt to characterize as interest or fees and expenses the amounts paid by checks that bear the notations "Principal" or "Principal Return", and this accounts for the bulk of the disputed deductions. However, we find that the direct transfer

of $34,050.83 from LF to CRM on April 23, 2003, is not a principal payment but is instead a payment of fees and expenses. Unlike the principal repayments that are all round numbers, this payment is not in an amount that suggests it is a return of principal, and the record shows no principal payments to which it is likely related. Moreover, CRM's sole owner, Bob Huff, testified about that payment and explained credibly that it was a supplemental payment that was determined to be appropriate after an initial payment had been made to compensate him for a transaction. We therefore add this to the amount that respondent concedes and hold that the Nelsons are entitled to deduct $1,369,726.40 of LF's payments to CRM.

We hold, however, that no further amounts are deductible, since the only other payments that were substantiated were checks designated as returns of CRM's principal and one direct transfer of $50,000 that was clearly a repayment of principal. Having contemporaneously characterized and documented the L.L.C.s' payments as returns of principal, Mr. Nelson cannot now credibly revise their character to achieve a reduced tax liability. It may be true, as the Nelsons argue, that a notation on the "Memo" line of a check is not necessarily dispositive of its character;[9]

---

[9]Against any mandate supposedly arising from a memo line entry, the Nelsons cite Christensen v. Commissioner, 40 T.C. 563 (1963). In that case, however, the memo notation "donation", id. at 568, did not substantiate a charitable contribution where the
(continued...)

but in this instance there is no credible evidence to contradict the notations on the checks, and there is considerable evidence to corroborate those notations.

In the first place, the L.L.C.'s "Principal" checks are in amounts consistent with CRM's prior loans. Second, they are generally accompanied by separate checks paying interest. Third, even Mr. Nelson in his trial testimony, which addressed each of the checks distinctly, explicitly characterized each "Principal" check as a return of CRM's principal. For example, about TF's check No. 1097 (marked "Principal Return"), Mr. Nelson said, "I paid Capital Resources. They put $400,000 in the deal. I paid them back the principal." The Nelsons' post-trial position thus contradicts Mr. Nelson's own trial testimony.

The only documents consistent with the Nelsons' position are the Forms 1099 that the L.L.C.s issued to CRM. However, these documents were prepared for tax purposes after the end of the taxable year not from bank records or business records showing interest payments but from the handwritten lists that Mr. Nelson prepared for the accountant, for which there are no supporting records. The only support that the Nelsons offered at trial to

---

[9](...continued)
check was not delivered to the alleged donee but was deposited into the same account from which it had been drawn and was simply credited by the donor to an internal account he maintained for the benefit of the donee. The facts in the instant case bear no resemblance to those of Christensen.

corroborate the Forms 1099 were checks attached to the forms--the same checks that we have discussed here, including those that bear the "Principal" and "Principal Return" notations that contradict the Forms 1099.  For those reasons, the Forms 1099 are not probative of the nature of the payments.

B.    The Nelsons' attempted proof of additional payments

As an apparent alternative argument,[10] the Nelsons offered trial testimony in support of the Forms 1099.  CRM's owner (Mr. Huff) generally asserted that he believed that the Forms 1099 were correct.  However, he testified that the checks "are also correct" ("I have no reason to doubt it").  To explain the discrepancy between the Forms 1099 and the check totals, Mr. Huff did not correct the notations on the checks but instead postulated additional fees earned by CRM but not yet transmitted by the L.L.C.s:[11]

---

[10]The Nelsons do not state that the contention addressed here in part II.B is an alternative to the contention addressed in part II.A, but the two arguments are not consistent with each other.  That is, when the Nelsons contend (as they do) that a notation on the "Memo" line of a check is not necessarily dispositive of its character, they obviously argue that one or more of the ostensible "Principal" checks are in fact their payments of additional interest or expenses.  But when Mr. Nelson states that "the checks are short" (see infra note 11), he evidently contends that the additional interest or expense amounts were paid other than by the checks.

[11]Mr. Nelson seemed to give a similar explanation when he stated, "The 1099s were income that I received [from the account holders] that I was obligated to document [i.e., to account to CRM] for 2003, and the checks are short because it was money that
(continued...)

> I had money that I wanted to invest in those deals that were going early in January [2004], and I asked him just to retain the money. * * * He did not pay me some of the fees [earned in 2003] because I planned on investing them.

It is not inconceivable that someone entitled to receive taxable income would recognize the income but would forgo actual transfer of the money and would instead ask that it be reinvested with his obligor. (By analogy, a shareholder entitled to dividends may automatically reinvest them in the corporation. He receives a Form 1099 and recognizes the dividend income but acquires additional shares of stock.) However, even where the obligee is held to have "constructively received" payment, a cash-basis obligor does not necessarily obtain a corresponding deduction for a supposed "constructive payment". See Unico Sales & Mktg., Inc. v. Commissioner, T.C. Memo. 1999-242 (and cases cited therein).

The Nelsons disclaim any reliance on a "constructive payment" theory; but the supposedly alternative theory they articulate--that they actually paid the amount to CRM because those amounts were "retained under the same terms and conditions [as prior investments had been] and therefore has the economic equivalent of principal"--fails for lack of proof. Both the

---

[11](...continued) we were putting in another deal at the end of December." When he was asked why he did not have checks that match the Forms 1099 in this instance, Mr. Nelson stated, "Because at the end of December there was money going into another deal and he left his money with me."

amount supposedly retained and those alleged "terms and conditions" are unspecified and unsupported. There are no contracts, journal entries, statements, notes, minutes, memoranda, or any other documents of the L.L.C.s to corroborate or quantify any earned but unpaid fees or any terms on which they might have been reinvested with the L.L.C.s. The Nelsons do not document the accounting for the distinct transactions and do not demonstrate that, either as a matter of bookkeeping or in economic reality, both a payment to CRM and a reinvestment with an L.L.C. took place. Neither Mr. Nelson nor Mr. Huff explained what the amount of unpaid fees was or how it was computed. Nor did the Nelsons offer any books or records of CRM to show that CRM had characterized the transactions according to this scenario, nor did they offer into evidence any tax returns of CRM to show that it had reported income consistent with this scenario.

The Nelsons are entitled to deduct the amounts they actually paid to CRM as interest, expenses, or fees. They are not entitled to deduct amounts they paid to CRM as returns of principal nor to deduct amounts that they did not prove that they actually paid.

## IV.  Section 6662(a) accuracy-related penalty

The IRS determined that the Nelsons are liable for the accuracy-related penalty of section 6662(a) because their

underpayment was a "substantial understatement of income tax" under section 6662(b)(2).[12]  By definition, an understatement of income tax is substantial if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return.  Sec. 6662(d)(1)(A).  Pursuant to section 7491(c), the Commissioner bears the burden of production and must produce sufficient evidence showing the imposition of the penalty is appropriate in a given case.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect.  Id. at 447; see also Rule 142(a).

On their 2003 return the Nelsons reported taxable income of $1,560,486 and total tax of $534,673.  Since we sustain the disallowance of $404,330.07 of the interest and expenses claimed for payments by the L.L.C.s to CRM, and since the Nelsons have conceded more than $324,915 of unreported gain on their sale of property, their taxable income was understated by $729,245.  Under section 1(a) their marginal tax rate was 39.6 percent, at which rate additional income of $729,245 would yield an

---

[12]Under section 6662(b)(1), the accuracy-related penalty is also imposed where an underpayment is attributable to the taxpayer's negligence or disregard of rules or regulations; and respondent argues that the Nelsons' position reflects negligence. However, as we show below, respondent has demonstrated that the Nelsons substantially understated their income tax for 2003 for purposes of section 6662(b)(2).  Thus, we need not consider whether, under section 6662(b)(1), the Nelsons were negligent or disregarded rules or regulations.

additional liability of $288,781 and a total liability, when combined with the amount reported on their return, of $823,454. This very rough calculation will be corrected by the parties under Rule 155, but for the time being it is clear that the Nelsons' understatement of roughly $288,781 is greater than $5,000 and greater than 10 percent of the tax required to be shown on the return (i.e., 10 percent of $823,454, or $82,345) and is therefore "substantial" under section 6662(d)(1). Respondent has carried the burden of production imposed by section 7491(c). The accuracy-related penalty is mandatory; the statute provides that it "shall be added". Sec. 6662(a). The Nelsons bear the burden of proving any defenses,[13] see Higbee v.

---

[13]A taxpayer who is otherwise liable for the accuracy-related penalty may avoid the liability if he successfully invokes one of three other provisions: Section 6662 provides that an understatement may be reduced, first, where the taxpayer had substantial authority for his treatment of any item giving rise to the understatement or, second, where the relevant facts affecting the item's treatment are adequately disclosed and the taxpayer had a reasonable basis for his treatment of that item. Sec. 6662(d)(2)(B). Third, section 6664(c)(1) provides that if the taxpayer shows that there was reasonable cause for a portion of an underpayment and that he acted in good faith with respect to such portion, no accuracy-related penalty shall be imposed with respect to that portion. The record suggests no basis for any of these defenses.

_Commissioner_, _supra_ at 446, but they asserted none.  We therefore sustain the accuracy-related penalty.

To reflect the foregoing,

Decision will be entered under Rule 155.